UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| RAYTHEON COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>INDIGO SYSTEMS CORPORATION, a California corporation, and FLIR SYSTEMS, INC., an Oregon corporation,<br><br>Defendants. | Case No. 4:07 cv 109<br><br>**TRIAL BY JURY DEMANDED** |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, Raytheon Company ("RAYTHEON") hereby complains of Defendants, Indigo Systems Corporation ("INDIGO") and FLIR Systems, Inc. ("FLIR") as follows:

### JURISDICTION AND VENUE

1. The present action alleges infringement of certain United States Patents under 35 U.S.C. § 271, trade secret misappropriation under Texas common law, the Texas Theft Liability Act and California Civil Code §§ 3426, *et seq.*, unfair competition and intentional interference with existing and prospective business relationships and breach of contract.

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

3. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

### PARTIES

4. RAYTHEON is incorporated in the State of Delaware and has its principal place of business at 870 Winter Street, Waltham, Massachusetts 02451. RAYTHEON is an industry leader in defense and government electronics, space technical services, and business and special mission aircraft, with annual worldwide sales of over $20 billion. RAYTHEON, through Raytheon Vision

Systems ("RVS"), is one of the premier innovators in the field of infrared detectors and cameras. RVS is part of RAYTHEON's business unit known as Network Centric Systems, which is headquartered at 2501 West University Drive, McKinney, TX 75071. All references to RAYTHEON shall be deemed to include, as appropriate by the context, but is not limited to its relevant affiliates, business units, and predecessors in interest with respect to the subject matter hereof, including but not limited to RAYTHEON's RVS business and Amber Engineering.

5. INDIGO is currently a wholly owned subsidiary of FLIR, and is incorporated in the State of California, with its principal place of business at 70 Castilian Drive, Goleta, California, 93117. INDIGO has been properly served and has answered.

6. FLIR is incorporated in the State of Oregon and has its principal place of business at 27700A SW Parkway Avenue, Wilsonville, Oregon 97070. FLIR has been properly served and has answered. All references herein to INDIGO and FLIR shall be interchangeable.

## FACTS

7. Throughout the 1980s and 1990s RAYTHEON and/or its predecessors conducted pain-staking research and development in infrared technology. RAYTHEON became the acknowledged market leader in infrared technologies for both military and commercial applications.

8. RAYTHEON has been the recognized world leader in infrared detection technology. It has designed, developed and manufactured two types of infrared detectors – cooled and uncooled. Uncooled infrared detectors power infrared camera devices in a variety of applications in law enforcement, fire fighting, industrial, automotive, and military applications. Cooled infrared detectors offer state-of-the-art infrared capabilities and are used extensively in highly-secret military applications from missile guidance systems to fighter aircraft, tanks and naval warships.

9. In February 1996, one former high-ranking RVS executive, along with two employees of RAYTHEON's predecessors, resigned to start a new company, INDIGO, which they claimed was going to provide independent consulting to companies like RAYTHEON. These three, among others, all had intimate knowledge of RAYTHEON's trade secrets. INDIGO specifically represented to RAYTHEON that it wanted to support RAYTHEON's continued development of ever-more-sophisticated read-out integrated circuits for various applications and that it would not compete in the business of manufacturing and sales of FPA (Focal Plane Arrays) and ROIC (Read Out Integrated Circuits) – the key components in infrared camera.

10. As a result of INDIGO's representations, RAYTHEON and INDIGO developed a collaborative relationship. In fact, shortly after INDIGO's founding, in March 1996, RAYTHEON and INDIGO entered into a Confidential Disclosure Agreement ("CDA"). RAYTHEON and INDIGO established this confidential relationship so that INDIGO could provide consulting and design services in support of RAYTHEON's development of certain infrared cameras and detectors.

11. Three months after the first CDA, RAYTHEON and INDIGO executed a second CDA so that INDIGO could provide services supporting RAYTHEON's ROIC chips. Four months later, in October 1996, RAYTHEON and INDIGO entered into a third CDA also related to RAYTHEON's ROIC chips.

12. RAYTHEON and INDIGO entered into a fourth CDA in February 1997 to enable INDIGO to provide a broader spectrum of confidential design work for RAYTHEON. Then, nine months later, RAYTHEON and INDIGO entered a fifth CDA in November 1997. Like the February 1997 CDA, the November 1997 CDA granted INDIGO nearly unlimited access to RAYTHEON's proprietary data and products.

13. Each of the CDAs between RAYTHEON and INDIGO provided that the proprietary information given to INDIGO would remain RAYTHEON's property and would be used by INDIGO only for the purpose outlined in the CDA.

14. RAYTHEON's use of INDIGO to provide confidential and highly proprietary design and manufacturing services continued for several more years. In fact, the RAYTHEON/INDIGO collaborative relationship that began in March 1996 continued through at least January 2005.

15. During these years of collaboration, RAYTHEON entrusted INDIGO with access to scores of confidential information relating to a host of RAYTHEON's current and future products. Had it not been for the promises of confidentiality and the execution of numerous CDAs, RAYTHEON would not have permitted INDIGO access to any of its confidential information. RAYTHEON's confidential information is not published in the public domain and its products are largely restricted to military customers or commercial customers that agree to maintain the confidentiality of RAYTHEON's intellectual property.

16. Until recently, RAYTHEON did not believe or even suspect that INDIGO or its employees were violating RAYTHEON's trust or misappropriating RAYTHEON's confidential information because of the existence of Confidential Disclosure Agreements, individual employee confidentiality agreements, the extensive use of secure facilities, document tracking and multi-level supervision of work product. In addition to the numerous CDAs, RAYTHEON also utilized a rigid and thorough intellectual property ownership procedure that required each of its employees to acknowledge RAYTHEON's ownership of all intellectual property when the employee was initially hired, during that employee's tenure and upon that employee's termination from the company. At all times relevant to this lawsuit, RAYTHEON has always received assurances from

each employee that terminated his or her employment with RAYTHEON that the former employee would honor the intellectual property rights of RAYTHEON upon termination.

17.     INDIGO's numerous agreements to keep RAYTHEON's information confidential, and RAYTHEON's former employees' promise to honor RAYTHEON's intellectual property rights, gave RAYTHEON no reason to believe that any theft or misappropriation of its trade secrets would occur.

18.     Unbeknownst to RAYTHEON, and despite INDIGO's agreements with RAYTHEON and its representations that it would not directly compete against RAYTHEON in the infrared camera arena, INDIGO implemented a fundamental change in its business plan and decided to become a direct competitor of RAYTHEON in both the 'cooled' and 'uncooled' Focal Plane Array (FPA) business.

19.     In March 2004, RAYTHEON acquired an INDIGO Merlin camera for purposes of reverse-engineering it to see how INDIGO was manufacturing its cooled camera. At this time, RAYTHEON had no suspicion or belief that INDIGO had actually misappropriated any of RAYTHEON's intellectual property. Instead, RAYTHEON purchased this camera simply to see how one of its competitors was manufacturing its cooled camera.

20.     Though the Merlin camera was acquired in March 2004, it was not disassembled or reverse-engineered until August 2004. As a result of the August 2004 disassembly, RAYTHEON determined that several of its patents may have been improperly utilized by INDIGO, and RAYTHEON began to see hints that maybe even some of its trade secrets were being used. Prior to this August 2004 disassembly, RAYTHEON had absolutely no reason to suspect that INDIGO had improperly utilized any of its intellectual property. In fact, as a result of the long-standing confidential relationship with INDIGO, the assurances of its former employees, and the reputation of INDIGO's principals, RAYTHEON assumed that INDIGO had developed completely new

methods for the design and manufacture of its infrared cameras and detectors. Though RAYTHEON disassembled the Merlin camera in August 2004, it did not understand the depth and breadth of its trade secrets that had been used or disclosed, presumably through its former employees, until a comprehensive review of its former employees' personnel files was conducted in February 2007.

21. Until recently, RAYTHEON and INDIGO did not compete for similar contracts or offer similar products. And no time between 1996 and the present did any of RAYTHEON's customers raise questions about the similarity between RAYTHEON and INDIGO products. Likewise, at no time did anyone in the industry raise the idea with RAYTHEON that INDIGO might be copying RAYTHEON's products or improperly utilizing RAYTHEON's intellectual property.

22. And, even though Raytheon began to suspect that some of its intellectual property had been compromised as a result of the August 2004 reverse-engineering, RAYTHEON did not suspect that the Defendants might have tortuously interfered and unfairly competed with RAYTHEON's past, present and future business relations until RAYTHEON lost the Armed Reconnaissance Helicopter ("ARH") contract in July 2006.

23. RAYTHEON had lost other contracts to INDIGO, such as the Joint Strike Fighter, Litening, RAID, BAMS and Fire Scout programs. RAYTHEON, however, had no reason to suspect that such contract losses were the result of INDIGO's inappropriate use of RAYTHEON's intellectual property, whether patented inventions or trade secrets, because those contracts had been awarded prior to RAYTHEON's reverse-engineering of the Merlin camera. RAYTHEON's confidential relationship with INDIGO and its strict intellectual property controls gave it no reason to suspect that unfair competition had a hand in any of INDIGO's early contract successes.

24. INDIGO's principals knew that creating a fully-functional infrared FPA and ROIC capability from scratch would require years of research and development and trial and error. There are few competitors in this highly-specialized and lucrative market and little, if any, shared technology in the public domain. INDIGO embarked on a calculated course of action to jump to market by undertaking a systematic effort to hire away key personnel from RAYTHEON in each of the critical research and design disciplines where INDIGO lacked the knowledge necessary to compete.

25. Since INDIGO's founding, Defendants have hired no less than forty-four (44) RAYTHEON employees who had knowledge of one or more of RAYTHEON's trade secrets.[1] INDIGO has introduced various competing infrared detection products in a fraction of the time ordinarily expected for the research and development of such complex and secretly-developed products.

26. By using RAYTHEON's patented technology and misappropriating numerous proprietary RAYTHEON trade secrets, INDIGO successfully competed for and won major government contracts, such as JSF, Litening, RAID, BAMS, ARH and Fire Scout. In the commercial sector, INDIGO used its improperly-obtained special knowledge to compete for and obtain large commercial contracts, including contracts in automotive, mining, law enforcement and other commercial applications.

27. But for INDIGO's wrongful misappropriation and use of RAYTHEON's proprietary technology and patented inventions, INDIGO would neither have been capable of competing for nor been awarded the contracts and such contracts would, by necessity, have been awarded to RAYTHEON.

---

[1] Plaintiff has provided Defendants with a detailed listing of these former employees, including their specialties while with Raytheon, through the discovery process.

## COUNT I

### TORTIOUS INTERFERANCE WITH EXISTING CONTRACTS AND PROSPECTIVE BUSINESS RELATIONSHIPS

28. RAYTHEON incorporates herein the allegations of Paragraphs 1 through 27.

29. Defendants, through their employees, agents, consultants, subcontractors, subsidiaries and parents, intentionally interfered with RAYTHEON's existing contracts and prospective business relationships both in commercial and military business sectors, in both cooled and uncooled technology. This interference included deliberate and successful efforts to destroy RAYTHEON's market share using stolen and infringing technology, which enabled them to produce products at a significant price advantage. INDIGO was able to achieve these cost advantages by avoiding the expensive research and development costs and efforts necessary to successfully design and mass produce high-quality cooled and uncooled FPAs, ROICs and related components. As such, Defendants tortiously interfered with RAYTHEON's existing contracts. Moreover, there was a reasonable probability and expectation that RAYTHEON would have entered into a business relationship with entities in the commercial and military sectors but for Defendants' intentional interference and wrongful acts.

30. RAYTHEON did not discover, and could not have reasonably discovered that Defendants tortiously interfered with RAYTHEON's current and prospective business relations until RAYTHEON lost the ARH contract in July 2006. Although RAYTHEON had previously lost other contracts to INDIGO, RAYTHEON had no reason to suspect that such contract losses were the result of INDIGO's inappropriate use of RAYTHEON's intellectual property, whether patented inventions or trade secrets, because those contracts had been awarded prior to RAYTHEON's reverse-engineering of the Merlin camera in August 2004. RAYTHEON's confidential relationship with INDIGO and its strict employee intellectual property procedures

gave it no reason to suspect that misappropriation of its RAYTHEON's trade secrets had a hand in any of INDIGO's early contract successes.

31. As a direct and proximate result of Defendants' interference, Plaintiff has suffered, and will continue to suffer, damages resulting from loss of military contracts, such as JSF, Litening, RAID, BAMS and Fire Scout, and commercial business, including but not limited to its loss of the BMW contract and other commercial product applications.

## COUNT II

## PATENT INFRINGEMENT--'663 PATENT

32. RAYTHEON incorporates herein the allegations of Paragraphs 1 through 31.

33. RAYTHEON is the owner of all right, title and interest in and to United States Patent No. 5,021,663 (the '663 Patent) with the right to recover damages for all past infringement of the patent.

34. The '663 Patent pertains, among other things, to the design of, and method of fabrication of, certain aspects of focal plane arrays for use in uncooled infrared detectors.

35. The '663 Patent issued June 4, 1991. Following re-examination by the United States Patent Office, a certificate of re-examination was issued on July 1, 1997. A true and correct copy of the '663 Patent together with its re-examination certificate has been provided to Defendants.

36. INDIGO and FLIR have made, used, offered for sale, and sold products, or used methods that infringe upon RAYTHEON's rights under the '663 Patent.

37. Upon information and belief, INDIGO and FLIR were each aware of the '663 Patent prior to the commission of some or all of the infringing acts alleged herein, and their infringement has been willful.

38. As a result of the infringement by INDIGO and FLIR, RAYTHEON has been damaged.

39. The willful infringement of the '663 Patent by INDIGO and FLIR makes this an exceptional case under 35 U.S.C. § 285.

## COUNT III

## PATENT INFRINGEMENT--'943 AND '437 PATENTS

40. RAYTHEON incorporates herein the allegations of Paragraphs 1 through 39.

41. RAYTHEON is the owner of all right, title and interest in and to United States Patent Nos. 5,449,943 (the '943 Patent) and 5,646,437 (the '437 Patent) with the right to recover damages for all past infringement of these patents.

42. The '943 and '437 Patents each pertain, among other things, to the design of, and method of fabrication of, focal plane arrays for use in indium antimonide ("InSb") cooled infrared detectors.

43. The '943 Patent issued September 12, 1995. A true and correct copy of that patent has been provided to Defendants.

44. The '437 Patent issued July 8, 1997. A true and correct copy of that patent has been provided to Defendants.

45. INDIGO and FLIR have made, used, offered for sale, and sold products, or used methods that infringe upon RAYTHEON's rights under the '943 Patent and '437 Patent.

46. Upon information and belief, INDIGO and FLIR were each aware of the '943 and '437 Patents prior to the commission of some or all of the infringing acts alleged herein, and their infringement has been willful.

47. As a result of the infringement by INDIGO and FLIR, RAYTHEON has been damaged.

48.     The willful infringement of the '943 and '437 Patents by INDIGO and FLIR makes this an exceptional case under 35 U.S.C. § 285.

## COUNT IV

## PATENT INFRINGEMENT-- '820 PATENT AND '908 REISSUE

49.     RAYTHEON incorporates herein the allegations of Paragraphs 1 through 48.

50.     RAYTHEON is the owner of all right, title and interest in United States Patent No. 5,043,820 ( the '820 Patent) and Reissued United States Patent No. RE 34,908 (the '908 Reissue) (collectively, the ROIC Patents) with the right to recover damages for all past infringement of these patents.

51.     Each of these patents pertains to designs of readout integrated circuits ("ROICs") that seek, among other things, to simplify the number of transistors required to perform the necessary processing of the signals received from the individual infrared detector elements.

52.     The application for the '820 Patent was filed on March 27, 1989 and the patent issued on August 27, 1991. A true and correct copy of that patent has been provided to Defendants.

53.     The original application relating to the '908 Reissue was filed on March 27, 1990. An initial patent issued from that application on January 22, 1992. Subsequently, an application for reissue was properly filed on January 24, 1994. That application was granted by the United States Patent Office and the '908 Reissue issued on April 18, 1995. A true and correct copy of the '908 Reissue has been provided to Defendants.

54.     A high-ranking senior design engineer of RAYTHEON resigned to co-found Defendant INDIGO. Prior to his resignation, he was engaged in the design of ROICs. He worked during this period with one or more of the named inventors on these ROIC Patents, and he would have been familiar with the '820 Patent and '908 Reissue owned by RAYTHEON.

55.     RAYTHEON has previously warned INDIGO against infringing these ROIC patents.

56. In spite of their awareness of RAYTHEON's ROIC patents, INDIGO and FLIR have made, used, offered for sale, and sold products, or used methods that infringe upon RAYTHEON's rights under the '820 Patent and '908 Reissue.

57. On information and belief, INDIGO and FLIR have willfully and knowingly made, used, offered for sale, and sold infrared detectors, or used methods that infringe upon RAYTHEON's rights under the '820 Patent and the '908 Reissue.

58. As a result of the infringement by INDIGO and FLIR, RAYTHEON has been damaged.

59. The willful infringement of the '820 Patent and the '908 Reissue by INDIGO and FLIR makes this an exceptional case under 35 U.S.C. § 285.

## COUNT V

## TRADE SECRET MISAPPROPRIATION AND VIOLATIONS OF THE TEXAS THEFT LIABILITY ACT – T<small>EX</small>. C<small>IV</small>. P<small>RAC</small>. & R<small>EM</small>. C<small>ODE</small> §134.001 ET. SEQ.

60. RAYTHEON incorporates herein the allegations of Paragraphs 1 through 59.

61. RAYTHEON is the owner of all right, title and interest in various designs, techniques, processes and methods of fabrication of infrared detectors and cameras and their associated components incorporating such detectors, as well as experimental information related to the evaluation and selection of such designs, techniques and methods (hereinafter "Trade Secrets").[2]

62. RAYTHEON derives independent economic value, both actual and potential, and is afforded an opportunity to obtain an advantage over its competitors from the fact that the Trade Secrets are not generally known to the public or to other persons who can obtain economic value from their disclosure or use.

---

[2] Plaintiff has previously provided Defendants with a detailed listing of the potentially-relevant trade secrets and is in the process of completing its production of all relevant documentation substantiating the discovery of each of those trade secrets by Raytheon.

63. The Trade Secrets are the subject of efforts by RAYTHEON that are reasonable under the circumstances to maintain their secrecy.

64. INDIGO and FLIR wrongfully acquired some or all of the Trade Secrets under circumstances giving rise to a duty to maintain their secrecy, from or through persons who owed RAYTHEON, or its predecessor-in-interest, a duty to maintain their secrecy and limit their use, and who had neither express nor implied consent to make such disclosure of that information, or knowingly or with reason to know from persons who had employed improper means to acquire the trade secret information.

65. Prior to August 2004, when it disassembled INDIGO's Merlin camera, RAYTHEON did not have facts available to it that would have enabled it to discover, or which should have enabled it to discover, Defendants' misappropriation of trade secrets. Prior to its August 2004 disassembly, RAYTHEON had absolutely no reason to believe or suspect that INDIGO would improperly utilize any of its intellectual property. Because of its long-standing confidential relationship with INDIGO, the assurances of RAYTHEON's former employees, and the reputation of INDIGO's principals, RAYTHEON assumed that INDIGO had developed completely new methods for the design and manufacture of its infrared cameras and detectors. And even though RAYTHEON disassembled the Merlin camera in August 2004, it did not understand the depth and breadth of its trade secrets that had been used or disclosed through its former employees until a comprehensive review of its former employees' personnel files was conducted in February 2007.

66. INDIGO and FLIR have misappropriated RAYTHEON's Trade Secrets.

67. The misappropriation by INDIGO and FLIR has been willful and malicious.

68. RAYTHEON has suffered damages as a result of the alleged misappropriation.

## COUNT VI

## UNFAIR COMPETITION BY MISAPPROPRIATION OF TRADE SECRETS

69. RAYTHEON incorporates herein the allegations of Paragraphs 1 through 68.

70. RAYTHEON's trade secrets were discovered and developed solely as a result of extensive time, labor, skill, and money expended by RAYTHEON.

71. Defendants used RAYTHEON's trade secrets in competition with RAYTHEON, thereby gaining a special advantage in that competition because the Defendants were burdened with little or none of the time and expense incurred by RAYTHEON.

72. RAYTHEON did not discover, and could not have reasonably discovered that Defendants engaged in unfair competition until RAYTHEON lost the ARH contract in July 2006.

73. RAYTHEON has suffered commercial damage as a result of Defendants' unfair competition.

## COUNT VII

## BREACH OF CONTRACT

74. RAYTHEON incorporates herein the allegations of Paragraphs 1 through 73.

75. The CDAs between RAYTHEON and INDIGO were and are binding and enforceable contractual agreements that were voluntarily entered into by INDIGO.

76. In conjunction with the various CDAs, RAYTHEON provided INDIGO nearly-unlimited access to RAYTHEON's trade secrets, confidential and proprietary information and products.

77. Per the express terms of the CDAs, INDIGO agreed that RAYTHEON's proprietary information would remain RAYTHEON's property and would be used by INDIGO only for the purposes outlined in the CDAs (i.e. for the development of RAYTHEON products).

78.     Defendants breached, and continue to breach, the various CDAs by making or participating in the unauthorized disclosure and use of RAYTHEON's trade secrets and confidential and proprietary information for purposes other than those outlined in the CDAs, namely the design, manufacture and sale of Defendants competing products.

79.     These breaches have proximately caused harm to RAYTHEON. RAYTHEON seeks damages for the harm it has suffered and will continue to suffer as a result of Defendants' breaches of the CDAs.

**WHEREFORE,** RAYTHEON prays for judgment that:

A.     United States Patent Nos. 5,021,663, 5,449,943 and 5,646,437, RE 34,908 and 5,043,820 (the "Patents") have been infringed by both INDIGO and FLIR;

B.     Defendants, their officers, agents, servants and employees, and those persons in active concert and participation with any of them, be permanently enjoined from infringement of the Patents;

C.     RAYTHEON be awarded damages sufficient to compensate it for the infringement, but in no event less than a reasonable royalty for such infringement, and that such damages be increased to three times the amount found or assessed pursuant to 35 U.S.C. § 284, together with prejudgment interest;

D.     Declares the case to be exceptional pursuant to 35 U.S.C. § 285 and that RAYTHEON be awarded its attorneys' fees, costs and expenses in this action;

E.     RAYTHEON be awarded damages because of Defendants' tortious interference with existing contracts and prospective business relationships;

F.     RAYTHEON be awarded damages for any losses caused by Defendants' misappropriation of Plaintiff's trade secrets, and related unfair competition, including but not limited the disgorgement of any and all unjust enrichment enjoyed by the Defendants as a result of

their misappropriation that is not taken into account in computing damages for RAYTHEON's loss, but in no event less than a reasonable royalty; as well as the maximum damages allowed by the Texas Theft Liability Act, including actual damages, additional damages in the maximum amount allowed by law, attorneys' fees and costs;

G. RAYTHEON be awarded all damages allowed under the law, including its reasonable and necessary attorneys' fees, resulting from Defendants' breach of the CDAs;

H. Determines the misappropriation to have been willful and malicious and awarding exemplary damages in an amount twice those awarded in connection with misappropriation, together with RAYTHEON's attorneys' fees and costs to the extent permitted under law;

I. Defendants, their officers, agents, servants and employees, as well as any persons in active concert and participation with any of them, be permanently enjoined from further disclosure or use of the Trade Secrets;

J. Defendants, immediately return any and all documents, computer files, or other materials that directly or indirectly reveal the Trade Secrets;

K. RAYTHEON be awarded its costs; and,

L. RAYTHEON be awarded such other and further relief as the Court may deem just.

## DEMAND FOR JURY TRIAL

RAYTHEON hereby demands a jury trial on all issues.

Respectfully submitted,

**DATED:   November 13, 2007**      /s/  Martin E. Rose            .
Martin E. Rose - Lead Attorney
Texas State Bar No. 17253100
Ross Cunningham
Texas State Bar No. 24007062
Jennifer Murphy
Texas State Bar No. 24027560
**ROSE•WALKER, L.L.P.**
3500 Maple Ave., Suite 900
Dallas, TX 75219
Telephone: (214) 752-8600
Facsimile:  (214) 752-8700
mrose@rosewalker.com
rcunningham@rosewalker.com
jmurphy@rosewalker.com

Joe Kendall
Texas State Bar No. 11260700
**PROVOST & UMPHREY LAW FIRM, LLP**
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
jkendall@provostumphrey.com

Russell Wong
Texas State Bar No. 21884235
J. David Cabello
Texas State Bar No. 03574500
Keith A. Rutherford
State Bar No. 17452000
Scott Reese
Texas State Bar No. 24046696
Keana Taylor
Texas State Bar No. 24042013
**WONG, CABELLO, LUTSCH,**
**RUTHERFORD & BRUCCULERI L.L.P.**
20333 S.H. 249, Suite 600
Houston, Texas 77070
Telephone: (832) 446-2425
Facsimile: (832) 446-2424
rwong@counselip.com
dcabello@counselip.com
krutherford@counselip.com
sreese@counselip.com
ktaylor@counselip.com

**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

The undersigned certified that on this 13th day of November, 2007, all counsel of record were served with a copy of this document electronically and via certified mail, return receipt requested

/s/ Ross Cunningham
Ross Cunningham
