## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| RAYTHEON COMPANY, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:07-cv-109 |
| | § | |
| INDIGO SYSTEMS CORPORATION and | § | |
| FLIR SYSTEMS, INC., | § | |
|     Defendants. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT REGARDING AFFIRMATIVE DEFENSES

Before the court are the following:

1.  Plaintiff Raytheon Company's Motion for Partial Summary Judgment Regarding Affirmative Defenses and Brief in Support (de # 355);

2.  Defendants' Response to Plaintiff's Motion for Partial Summary Judgment Regarding Affirmative Defenses and Brief in Support (de # 390);

3.  Raytheon's Reply in Support of its Motion for Partial Summary Judgment Regarding Affirmative Defenses (de # 400); and

4.  Defendants' Sur-reply in Opposition to Plaintiff's Motion for Partial Summary Judgment on Affirmative Defenses (de # 415).

In its Motion, Raytheon seeks summary judgment in its favor on seven affirmative defenses asserted

by the Defendants.  Having reviewed the Motion, the arguments presented by the parties and the

relevant legal principles, the court is of the opinion that the Motion should be GRANTED IN PART,

DENIED AS MOOT IN PART, and DENIED IN PART.

## I.  BACKGROUND

Plaintiff Raytheon Company is a defense contractor with annual sales of over $20 billion.

Raytheon Vision Systems is a unit of Raytheon that develops and manufactures infrared imaging

equipment.  Raytheon Vision Systems is an entity formed of Amber Engineering, acquired by Raytheon in 1993, and the Santa Barbara Research Center, acquired in 1997.  Although many of the circumstances giving rise to this lawsuit occurred at either Amber or the Santa Barbara Research Center prior to their combination, in the interest of simplicity, the court will refer to the above-mentioned entities collectively as Raytheon.

Indigo Systems is a wholly owned subsidiary of FLIR.  Indigo is also in the infrared imaging industry.  Indigo was founded in 1996 by three former Raytheon employees and sold to FLIR in 2004.  The court will refer to these entities as Indigo.

In March of 1996, James Woolaway and two other Raytheon employees resigned their positions to launch Indigo in pursuit of opportunities in "analog and digital mixed signal silicon integrated circuit design."  In his letter of resignation, Woolaway pledged neither to recruit Raytheon personnel during his remaining time at Raytheon nor during "a consulting relationship [between Indigo and Raytheon] if this were to develop."

Indigo and Raytheon quickly consummated a commercial relationship whereby Indigo provided consulting services on various Raytheon projects.  The parties' first contract was governed by a Confidential Disclosure Agreement ("CDA") which obligated Indigo to maintain the confidentiality of Raytheon's intellectual property transmitted to it in the course of performance of the consulting contract.  The parties would eventually enter into more than ten services contracts, which involved increasingly more sophisticated consultation, requiring Raytheon to divulge more of its confidential information and concomitantly increasing Indigo's confidentiality commitments. Each contract was governed by a CDA in order to protect Raytheon's intellectual property.  Overall, there were six separate CDAs, the final two of which allowed Indigo to access Raytheon's

intellectual property relating to "focal plane arrays[1] and associated components" in order to advise Raytheon on certain projects.

Though generally healthy, the Indigo-Raytheon relationship did encounter formidable turbulence. Raytheon began to suspect that Indigo was systematically hiring former Raytheon employees in order to obtain Raytheon trade secrets. Indeed, from its inception, Indigo has hired at least seventy-five former Raytheon employees. On February 2, 1997, Raytheon addressed its suspicions to Indigo in a formal letter. Indigo responded just over a week later with a letter from William Parrish, one of its founders, claiming that the accusations were baseless and outlining a number of company policies designed to eliminate the risks of improper use of Raytheon's intellectual property.

Based upon this and other assurances, Raytheon sent Indigo's outside counsel a letter indicating that it would not pursue any legal action against Indigo. Indigo's counsel responded with a letter indicating that Indigo had not misused any of Raytheon's proprietary technology and that any suggestion to the contrary was "inaccurate and offensive." Raytheon and Indigo reached an agreement in July of 1997 pertaining to Indigo's future hiring of former Raytheon personnel. Indigo agreed to notify Raytheon whenever it intended to hire former Raytheon personnel and to require all future Indigo employees to refrain from using the intellectual property of former employers. Additionally, Raytheon obtained confidentiality agreements regarding its proprietary information from both incoming and departing employees. Indigo secured confidentiality agreements from new employees forbidding the use of the confidential information of former employers. On the basis of

---

[1] A focal plane array is an integral component of an infrared camera. (Sec. Am. Compl. ¶ 10.)

this web of assurances, agreements and policies, Raytheon decided not to pursue any legal action against Indigo, and the parties maintained their contractual relationship until January of 2005.

In March of 2004, Raytheon acquired a Merlin camera, an infrared camera developed and manufactured by Indigo.   According to Raytheon, it had no suspicion of impropriety on Indigo's part; rather, it simply wanted to take the camera apart to see how a competitor was manufacturing an infrared camera.  Raytheon waited until August of 2004 to disassemble the Merlin camera, and it found what it thought to be evidence of misuse of several Raytheon patents and trade secrets.

In July of 2006, Raytheon lost its fourth military contract to Indigo, the Armed Reconnaissance Helicopter contract.  Raytheon claims that this event confirmed the fears aroused by its disassembly of the Merlin camera in August of 2004.   In February of 2007, Raytheon conducted an investigation into potential misuse of its intellectual property by Indigo, reviewing the files of those employees who went on to work for Indigo.  Identifying a correlation between the areas of expertise of those employees and the types of technology developed in the interim by Indigo, Raytheon became convinced that Indigo's achievements were attributable largely to the exploitation of Raytheon's intellectual property illicitly obtained both through the hiring of Raytheon employees and the secrets divulged during the course of the parties' contractual relationship.  Raytheon initiated this action on March 2, 2007.

In this Motion, Raytheon seeks summary judgment on Indigo's affirmative defenses of release, acquiescence and consent, accord and satisfaction, waiver, license, failure to mitigate and justification.  Indigo has abandoned its defenses of accord and satisfaction and license.  Raytheon has abandoned its tortious interference claim—the only claim against which Indigo asserted the affirmative defense of justification.   Accordingly, the court only considers whether summary

judgment is proper as to Indigo's defenses of release, acquiescence and consent, waiver and failure to mitigate.

## II.  LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Id*. at 255.  The substantive law identifies which facts are material. Id. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id*. at 247.  If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure all of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 323, 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).  Once the movant has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial."

FED. R. CIV. P. 56(e); *accord Anderson*, 477 U.S. at 257.  In order to create a genuine issue, the evidence "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

### III.  DISCUSSION & ANALYSIS

*A.     Release*

Indigo has asserted the affirmative defense of release.  Indigo claims that the 1997 agreement released Indigo from liability for the claim of trade secret misappropriation asserted here by Raytheon.  As discussed above, Raytheon had general suspicions that Indigo was hiring Raytheon personnel in order to obtain sensitive information proprietary to Raytheon.  Those suspicions culminated in the 1997 agreement, in which Raytheon discharged all claims against Indigo of which it was presently aware in exchange for hiring concessions by Indigo designed to protect Raytheon's trade secrets.

A release is generally nothing more than a contract, interpreted under general contract principles.  *See Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, Civ. A. No. 3:04-CV-1866, 2007 U.S. Dist. LEXIS 62105, at *30 (N.D. Tex. Aug. 23, 2007).  A release is a complete bar to recovery for claims contemplated therein.  *Id.*  Indigo argues that because a misappropriation "that continues over time is a single cause of action," TEX. CIV. PRAC. & REM. CODE § 16.010(b), and because Raytheon's claim in this lawsuit shares common factual underpinnings with the behavior released in 1997, its defense of release should be allowed to go to trial.  Indigo's argument is unpersuasive.

To give credence to Indigo's position, the court would be required to find that the dispute resolved by the July 30, 1997 agreement continued into the actions that form the basis of Raytheon's

claim in this lawsuit.  Yet, it is clear from the agreement and from the array of procedural mechanisms developed by the parties during that time that any misappropriation committed by Indigo was part of a subsequent and separate scheme.  The release does not purport to, and quite plainly does not, cover those actions that comprise the alleged later scheme, which forms the basis of Raytheon's claims here.  Moreover, accepting Indigo's argument would lead to disastrous results for an entity that wished to settle claims of trade secret misappropriation.  Under Indigo's theory, the 1997 agreement would hardly be a settlement of an existing dispute; it would be a license for Indigo to engage in plainly illegal behavior—even blatantly so—without threat of recourse. Because Indigo has introduced no evidence of a later release, there remains no triable issue of fact with regard to its release defense.

## B.     *Acquiescence and Consent*

Indigo also asserts the affirmative defense of acquiescence.  It argues that the nearly ten year gap between the parties' 1997 agreement and Raytheon's commencement of this action indicate an assurance to Indigo that Raytheon would not assert whatever rights it had against Indigo. "Acquiescence involves the plaintiff's implicit or explicit assurances to the defendant which induce[] reliance by the defendant." *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998) (quoting *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985) (internal quotation marks omitted).  Notably, a party's acquiescence cannot be inferred from periods of inaction following explicit disapproval of what that party deems to be offending behavior. *Conan Props.*, 752 F.2d at 153 (". . .a showing of mere delay will not support a finding of. . .acquiescence"); *Elvis Presley Enters.*, 141 F.3d at 206 ("The period of silence relevant to acquiescence would not include any time after the cease and desist letter was sent because [the plaintiff] explicitly

communicated its objection. . ."); *Bd. of Regents, Univ. of Texas Sys. v. KST Elec., Ltd.*, 550 F.

Supp.2d 657, 669 (W.D. Tex. 2008) (". . .the time-period after [the plaintiff] sent a cease and desist

letter to [the defendant] cannot be taken into consideration insofar as the acquiescence defense is

concerned."). The communications from Raytheon that lead to the 1997 agreement indicated in no

uncertain terms that Raytheon did not acquiesce to any attempts by Indigo to misappropriate its

intellectual property. Raytheon's (and presumably Indigo's) continued adherence to the protections

put in place at that time prevent Indigo from relying on Raytheon's implicit acquiescence. Because

Indigo has not introduced evidence of explicit acquiescence on the part of Raytheon, its defense fails

as a matter of law.

C.     *Waiver*

Waiver, an affirmative defense in Texas, "can be asserted against a party who intentionally

relinquishes a known right or engages in intentional conduct inconsistent with claiming that right."

*Tenneco, Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996). Waiver can be

established by either express agreement or "silence or inaction" sufficient to manifest an intention

to forego the known right. *Id.* "Waiver is generally a question of fact, except where the facts and

circumstances are either admitted or clearly established." *Bott v. J.F. Shea Co.*, 388 F.3d 530, 534

(5th Cir. 2004) (citing *Tenneco*). In *Tenneco*, the plaintiffs challenged an assignment of stock in a

natural gas fractionation facility as violating a contractual right of first refusal. For three years, the

plaintiffs accepted the buyer of the stock as a co-owner. The Supreme Court of Texas decided the

defendants' waiver issue in their favor, citing the plaintiffs' three year period of inactivity with

regard to the new co-owner as sufficient to indicate an intent to waive their contractual right of first

refusal. *Tenneco*, 925 S.W.2d at 643. In this case, Raytheon waited nearly ten years from the date

of the 1997 agreement and well over two years after it disassembled the Merlin camera until it filed this lawsuit.  During that time, Indigo continued to hire Raytheon personnel and to grow in the infrared imaging industry.  Accordingly, genuine issues of material fact exist with regard to Indigo's waiver defense.

D.      *Failure to Mitigate*

A party that has suffered legal harm is under a duty to mitigate its damages "if it can do so with "trifling expense or with reasonable exertions." *Gunn Infiniti v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999) (internal quotation marks omitted).  As with many questions of reasonableness, application of the duty to mitigate is ordinarily a question of fact.  *Hygeia Dairy Co. v. Gonzalez*, 994 S.W.2d 220, 224 (Tex.App.—San Antonio 1999, no pet.).  Such is the case here.  Therefore, there remain genuine issues of material fact to be decided by the jury.

## IV.  CONCLUSION

Based on the foregoing, the court finds that Indigo's justification, license and accord and satisfaction defenses are now moot.  Accordingly, the Motion should be, and hereby is, DENIED AS MOOT with regard to those defenses.  The court finds further that there are no genuine issues of material fact remaining with regard to Indigo's release and acquiescence and consent defenses.  Accordingly, the Motion should be, and hereby is, GRANTED as to those defenses.  Finally, the court finds that genuine issues of material fact exist with regard to Indigo's waiver and failure to mitigate defenses.  Accordingly, the Motion should be, and hereby is, DENIED as to those defenses.

IT IS SO ORDERED.

**SIGNED this the 24th day of August, 2009.**

*Richard A. Schell*

RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE