IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| RAYTHEON COMPANY,<br>      Plaintiff,<br><br>v.<br><br>INDIGO SYSTEMS CORPORATION and<br>FLIR SYSTEMS, INC.,<br>      Defendants. | §<br>§<br>§<br>§    Case No. 4:07-cv-109<br>§<br>§<br>§<br>§ |

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S TRADE SECRET MISAPPROPRIATION, TORTIOUS INTERFERENCE, UNFAIR COMPETITION AND FRAUDULENT CONCEALMENT CLAIMS AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ADDRESSING FRAUDULENT CONCEALMENT AND STATUTE OF LIMITATIONS**

Before the court are the following:

1. Plaintiff's Motion for Partial Summary Judgment Addressing Fraudulent Concealment and Statute of Limitations (de # 356);

2. Defendants' Response to Plaintiff's Motion for Partial Summary Judgment Addressing Fraudulent Concealment and Statute of Limitations (de # 389);

3. Plaintiff's Reply Brief in Support of Plaintiff's Motion for Partial Summary Judgment Addressing Fraudulent Concealment and Statute of Limitations (de # 399);

4. Defendant's Surreply to Plaintiff's Motion for Partial Summary Judgment Addressing Fraudulent Concealment and Statute of Limitations (de # 416);

5. Defendants' Motion for Summary Judgment on Plaintiff's Trade Secret Misappropriation, Tortious Interference, Unfair Competition, and Fraudulent Concealment Claims (Counts I, V, VI, and VIII of the Second Amended Complaint) Based on Statute of Limitations (de # 357);

6. Plaintiff's Response to Defendants' Motion for Summary Judgment on Trade Secret Misappropriation, Tortious Interference, Unfair Competition, and Fraudulent Concealment Claims Based on Statute of Limitations (de # 387);

7. Defendants' Reply in Support of Defendants' Motion for Summary Judgment on Trade Secret Misappropriation, Tortious Interference, Unfair Competition, and

    Fraudulent Concealment Claims Based on Statute of Limitations (de # 401); and

8.  Plaintiff's Surreply Brief in Opposition to Defendants' Motion for Summary Judgment Addressing Fraudulent Concealment and Statute of Limitations (de # 411).

Among others, Raytheon has asserted claims for misappropriation of trade secrets, unfair competition, tortious interference with existing contracts and prospective business relationships and fraudulent concealment. The Defendants have asserted that each of the first three claims are barred by limitations. In response, Raytheon avers that the Defendants fraudulently concealed these causes of action and that the statute of limitations should therefore be tolled, making their claims timely. Raytheon moves for summary judgment on its fraudulent concealment claim. The Defendants move for summary judgment on the misappropriation, unfair competition, tortious interference and fraudulent concealment claims. In its Response to the Defendants' Motion, Raytheon informs the court that it is abandoning the unfair competition and tortious interference claims. (de # 387 at 1 n.1.) The court is of the opinion that Raytheon's trade secret misappropriation claim is barred by limitations. The evidence unearthed during discovery reveals that Raytheon was on notice of the facts underlying its claims long before it undertook to investigate those facts. Accordingly, whatever benefit Raytheon may have been able to claim under the fraudulent concealment doctrine did not toll the statute long enough such that Raytheon's claims in this lawsuit were timely asserted. Therefore, having considered the Motions, the responsive briefing and the relevant legal principles, the court is of the opinion that Raytheon's Motion should be DENIED and that the Defendants' Motion should be GRANTED.

## I. BACKGROUND

Plaintiff Raytheon Company is a defense contractor with annual sales of over $20 billion.

(Pl.'s Sec. Am. Compl. ¶ 4.) Raytheon Vision Systems is a unit of Raytheon that develops and manufactures infrared imaging equipment. (*Id*.) Raytheon Vision Systems is an entity formed of Amber Engineering, acquired by Raytheon in 1993, and the Santa Barbara Research Center, acquired in 1997. (de # 356 at 2 n.3.) Although many of the circumstances giving rise to this lawsuit occurred at either Amber or the Santa Barbara Research Center prior to their combination, in the interest of simplicity, the court will refer to the above-mentioned entities collectively as Raytheon.

Indigo Systems is a wholly owned subsidiary of FLIR. (Sec. Am. Compl. at ¶ 5.) Indigo is also in the infrared imaging industry. Indigo was founded in 1996 by three former Raytheon employees and sold to FLIR in 2004. (*Id*. at ¶ 9.) The court will refer to these entities as Indigo.

In March of 1996, James Woolaway and two other Raytheon employees resigned their positions to launch Indigo in pursuit of opportunities in "commercial analog and digital mixed-signal silicon and integrated circuit design." (de # 356 at 3.) In his letter of resignation, Woolaway pledged not to recruit Raytheon personnel either during his remaining time there or during "a consulting relationship [between Indigo and Raytheon] if this were to develop." (*Id*. at Ex. 1.)

Indigo and Raytheon quickly consummated a commercial relationship whereby Indigo provided consulting services on Raytheon projects related to readout integrated circuit design. (*Id*. at 4.) The parties' first consulting contract was governed by a Confidential Disclosure Agreement ("CDA") which obligated Indigo to maintain the confidentiality of Raytheon's intellectual property transmitted to it while it performed its end of the consulting contract. (*Id*.) The parties eventually entered into a series of consulting contracts, each of which was governed by a CDA. On February 5, 1997, the parties signed a CDA that allowed Indigo broader access to Raytheon's intellectual property so that Indigo could render more sophisticated services requested by Raytheon. (*Id*. at 4.)

The February 5, 1997 CDA would govern the remainder of the consulting agreements between the parties, the last of which was signed and performed in 2000. (*Id*. at 5.) This final CDA allowed Indigo to access Raytheon's intellectual property relating to "focal plane arrays[1] and associated components" in order to advise Raytheon on certain projects. (*Id*. at Ex. 9.)

Though generally healthy, the Indigo-Raytheon relationship did encounter a formidable roadblock. In 1997, Raytheon began to suspect that Indigo was systematically hiring former Raytheon employees in order to obtain Raytheon trade secrets. Indeed, from its inception through 2003, Indigo hired at least seventy-five former Raytheon employees. (de # 389 at 4.) On February 2, 1997, Raytheon addressed its suspicions to Indigo in a formal letter. (de # 356 at 6.) Indigo responded just over a week later with a letter from William Parrish, one of its founders. Parrish wrote that the accusations were baseless, and he outlined a number of company policies designed to eliminate the risks of improper use of Raytheon's intellectual property. (*Id*. at Ex. 11.) Indigo's outside counsel would later respond with a letter detailing Indigo's legal position and labeling Raytheon's concerns as "inaccurate and offensive." (*Id*. at Ex. 13.)

Based upon these assurances, Raytheon sent Indigo's outside counsel a letter outlining a proposed agreement between the two companies to settle their dispute. (*Id*. at Ex. 14.) Raytheon and Indigo reached an agreement on July 30, 1997 pertaining to Indigo's future hiring of former Raytheon personnel. Indigo agreed to refrain from hiring Raytheon personnel in the absence of Raytheon's permission for the remainder of 1997. Indigo also agreed, through June 30, 1998, to notify Raytheon of any plans to hire former Raytheon personnel and to require all future Indigo

---

[1] A focal plane array is an integral component of an infrared camera. (Sec. Am. Compl. ¶ 10.)

employees to refrain from using the intellectual property of former employers. In exchange, Raytheon and Amber released all claims against Indigo of which they were then aware. (*Id.*) In addition to this agreement, Raytheon obtained confidentiality agreements regarding its proprietary information from both incoming and departing employees. (*Id.* at 3 n.6.) Indigo also secured confidentiality agreements from new employees, reminding them of their duty to respect the confidential information of former employers. On the basis of this web of assurances, agreements and policies, Raytheon decided not to pursue any legal action against Indigo, and the parties maintained their consulting relationship, as mentioned, until 2000. Thereafter, the parties continued to collaborate to some extent on projects until January 2005.

After Raytheon stopped looking to Indigo for consulting services, the two companies worked on a couple of projects together. One project, which never got off the ground, would have involved Raytheon manufacturing infrared imaging components for Indigo. (de # 387 at Ex. G., 14:10-21.) The other project involved each company performing different steps in the manufacturing of cameras for a third party. (*Id.* at 13:17-24.) There was a third project in 2003 on which Indigo and Raytheon would have provided services to another third party, but that third party decided to manage that project without outside help. (*Id.* at Ex. C., 121:20-24.)

Meanwhile, Indigo was building a respectable profile in the infrared imaging market. For example, in 2000, Indigo successfully bid on the Litening military contract, under which it was to provide the military with cooled infrared cameras, beating out a number of competitors, including Raytheon. (de # 357 at 8.) Moreover, in March of 2003, Indigo won a subcontract from Northrop Grumman to provide infrared cameras in support of the $200 billion 21st Century F-35 Joint Strike Fighter contract ("JSF"). (*Id.*) Indigo was also awarded that contract over a number of competitors,

including Raytheon. Additionally, Indigo was able to attract an outside investment of over $10,000,000 from Northrop Grumman, another large player in the defense industry. (de # 387 at 9.) Finally, Indigo was acquired by FLIR in 2003 in a $190,000,000 transaction.

In March of 2004, Raytheon acquired a Merlin infrared camera, manufactured by Indigo, "to see how one of its competitors was manufacturing a competing camera." (Sec. Am. Compl. ¶ 27; de # 356 at 11.) Raytheon waited until August of 2004 to disassemble the Merlin camera. Upon disassembly, Raytheon found what it thought to be evidence of misuse of several Raytheon patents and trade secrets. (*Id*.) In February of 2007, Raytheon conducted an investigation into potential misuse of its intellectual property by Indigo, reviewing the files of those employees who left Raytheon and went on to work for Indigo. (*Id*.) Identifying a correlation between the areas of expertise of those employees and the types of technology developed in the interim by Indigo, Raytheon became convinced that Indigo's achievements were attributable largely to the exploitation of Raytheon's intellectual property, which it believed to have been illicitly obtained through the hiring of Raytheon employees. Raytheon initiated this action on March 2, 2007.

## II.  LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the

party opposing the motion for summary judgment. *Id*. at 255. The substantive law identifies which facts are material. *Id*. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id*. at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure all of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 323, 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *accord Anderson*, 477 U.S. at 257. In order to create a genuine issue, the evidence "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. DISCUSSION AND ANALYSIS

A defendant who raises the statute of limitations as a defense bears the burden of proving that a given claim is time-barred. *Hinsley v. Boudloche (In re Hinsley)*, 201 F.3d 638, 644 (5th Cir. 2000). A claim for misappropriation of trade secrets must be brought within three years of the date of its accrual. TEX. CIV. PRAC. & REM. CODE § 16.010(a) (Vernon 2008); CAL. CIV. CODE § 3246.6 (West 2008). A claim accrues, and the statute begins to run, once "the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." *Id*.; TEX. CIV. PRAC. & REM. CODE § 16.010(a). "A misappropriation of trade secrets that continues over time is a single cause

of action," such that additional thefts augment the single claim rather than constitute new and distinct claims. *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 365 (5th Cir. 2000); TEX. CIV. PRAC. & REM. CODE § 16.010(b); CAL. CIV. CODE § 3246.6.

Raytheon filed this lawsuit on March 2, 2007. Therefore, if its claim for misappropriation of trade secrets accrued on or before March 1, 2004, and if the facts of the case do not support some tolling theory, then its claim is time-barred. Though Raytheon has alleged that Indigo began stealing trade secrets at the outset of their relationship over twelve years ago, it asserts that both the discovery rule and the doctrine of fraudulent concealment preserve their claims against the statute of limitations.

Although the theories share some similarities, the discovery rule and fraudulent concealment are distinct and serve different policies. *Bernson v. Browning-Ferris Indus. of Cal., Inc.*, 873 P.2d 613, 615 (Cal. 1994); *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 736 (Tex. 2001). Fraudulent concealment is an equitable doctrine that estops a defendant from invoking the statute of limitations when his fraudulent behavior, apart from the underlying tortious activity, plays a role in concealing a cause of action from an otherwise diligent plaintiff who would have discovered the transgression, and, thus, would have been able to sue within the limitations period. *Seatrax*, 200 F.3d at 366; *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir. 2006). Fraudulent concealment tolls the statute of limitations until the plaintiff knew of his right of action or should have known "through the exercise of reasonable diligence." *Seatrax*, 200 F.3d at 366. Thus, tolling based on fraudulent concealment is not indefinite; only so "long as a plaintiff's reliance on the misrepresentations is reasonable" may he rely on the tolling effect of fraudulent concealment. *Grisham v. Philip Morris U.S.A., Inc.*, 151 P.3d 1151, 1159 (Cal. 2007). When an injured party "learns of facts, conditions,

or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action," the tolling effect of the doctrine ceases. *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1983); *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1057 (9th Cir. 2008) (stating that a plaintiff discovers his cause of action when he "at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge [of the cause of action]. . .") (quoting *Norgart v. Upjohn Co.*, 981 P.2d 79, 88 (Cal. 1999)). "Knowledge of such facts is in law equivalent to knowledge of the cause of action." *Borderlon*, 661 S.W.2d at 909; *accord Norgart*, 981 P.2d at 88.

Raytheon's fraudulent concealment theory rests on representations made by Indigo in the July 30, 1997 agreement, the series of CDAs that accompanied the services performed by Indigo for Raytheon, the parties' purportedly collaborative relationship thereafter and the confidentiality agreements it entered into with departing employees. These factual bases, Raytheon contends, toll the statute of limitations until August of 2004 when it disassembled the Merlin camera and, for the first time according to Raytheon, became concerned that its intellectual property had been stolen. Indigo argues that limitations were never tolled but that any tolling of limitations came to an end at some point before March of 2004 because Raytheon had reason to suspect misappropriation before that time, creating a duty to inspect those factual underpinnings or risk losing its claim. The court is in agreement with Indigo.

In 1997, Raytheon first addressed its suspicion of trade secret misappropriation to Indigo. Fearing that Indigo was targeting its personnel to gain an unfair advantage, Raytheon initiated a chain of correspondence that led to a mutual understanding regarding Indigo's hiring practices and the care with which Indigo was to treat Raytheon's proprietary information. Indigo intended for the

implemented measures to alleviate Raytheon's concerns over piracy. Indeed, Indigo's outside counsel described the July 1997 agreement as "a gesture which can be taken as reassurance" that Raytheon was not being victimized. (de # 217, Ex. B-6.) That agreement, and the other devices crafted by the parties, allowed them to resume normal business activity. Indigo's assurances reasonably convinced Raytheon that its fears of misappropriation were unfounded. In addition, the parties had entered into a series of agreements obligating Indigo to respect Raytheon's intellectual property in connection with the consulting services it was performing.[2] It would thus appear that Raytheon could find some refuge in the fraudulent concealment doctrine, but as discussed above, the tolling effect is not indefinite. *Seatrax*, 200 F.3d at 366; *Grisham*, 151 P.3d at 1159.

The July 30, 1997 agreement, which serves as the fundamental basis of Raytheon's fraudulent concealment claim, expired in June of 1998 on its own terms. In 2000, the parties' consulting relationship permanently dissolved as Raytheon opted to discontinue sending work to Indigo. (de # 357 at Ex. 3, 13:11-20.) Also in 2000, for the first time, Indigo won a military contract in direct competition with Raytheon. In March of 2003, it would repeat that success when Indigo won the infrared imaging component of the Joint Strike Fighter contract, again in direct competition with Raytheon.[3]

---

[2] Raytheon insists that the CDAs created a "confidential" relationship between the parties. But, as conceded by Raytheon's own witnesses, the work performed under the CDAs is unrelated to the trade secrets at issue in this lawsuit. (de # 389 at Ex. 4, 7:16-8:11; 71:21-72:8.) In any event, whether the parties entered into a confidential relationship as late as 2000 is irrelevant with respect to Raytheon's fraudulent concealment claim in this lawsuit for reasons that will become clear later in the discussion.

[3] Raytheon argues that Indigo's military contract victories did not create concern that Indigo was misusing its intellectual property because, once Northrop Grumman invested in Indigo, Raytheon believed Indigo to be Northrop's "captive subcontractor." (de # 387 at 9.) This argument misses the point because Indigo's wins, whatever the reasons for their occurrence,

In spite of these successes in the military market, Raytheon insists that it did not see Indigo as a competitor prior to its disassembly of the Merlin camera in August of 2004. Not only is this contention overwhelmingly set aside by the fact that Indigo did compete with, and beat, Raytheon in the pursuit of military contracts, but Raytheon's internal competitive assessments reveal that it tracked Indigo as a competitor as far back as 2000. (de # 389 at Exs. 22-24.) Moreover, Raytheon's witnesses testified that Indigo has been seen as a competitor well before 2004. (*See*, *e.g.*, *Id*. at Ex. 20, 36:5-6.) One witness even testified that Indigo was viewed as a competitor "from its initiation." (*Id*. at Ex. 3, 29:8-11.) Additionally, Raytheon has pled that it purchased the Merlin camera in March of 2003 to examine how one of its "competitors" was manufacturing a competing product. (Sec. Am. Compl. ¶ 27.) Raytheon maintains that the camera was purchased as part of a routine competitive analysis, but this contention is also belied by its own witnesses, at least five of whom testified that they had never heard of Raytheon taking such steps. (de # 389 at 5-6.) Why, then, would Raytheon take, what for it was, the unusual step of reverse engineering a competitive product if it did not do so in the pursuit of preexisting suspicions about that product or its manufacturer? Clearly Raytheon had developed an acute suspicion before March of 2004 that Indigo was infringing its intellectual property rights.

Raytheon also argues that after its possibly confidential relationship with Indigo ended in 2000, the two continued in what it calls a "collaborative relationship." This argument is unpersuasive for at least three reasons. First, it presumes that a collaborative relationship would impose upon the members of that relationship the same duties as are imposed on the participants of

---

established that Indigo was capable of manufacturing hardware that could be used in military contexts—the same market in which Raytheon vigorously competed.

a confidential relationship. That proposition is without basis. In some sense, any time parties deal with one another, they have a collaborative relationship in that each depends on the other to achieve some gain that it would be without in the absence of that dealing. "Contracting parties are generally not fiduciaries." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006). Second, the premise itself is called into serious question once again by Raytheon's own witnesses, one of whom testified that the collaborative label "is a—a stretch. I think we had a supplier relationship." (de # 389 at 11 (citing Ex. 1, 113:3-10); *see also* Ex. 13, 11:18-13:4; Ex. 5, 18:22-19:2.) Finally, the evidence pointed to by Raytheon to establish the purportedly collaborative relationship fails to do so. There were two projects after 2000 on which both Raytheon and Indigo would have worked but that never moved beyond initial discussions. As mentioned in Part I., *supra*, Raytheon and Indigo did work on a camera project for a third party, but Raytheon and Indigo merely performed different aspects of the manufacturing process for the third party. (de # 387 at Ex. G., 13:17-24.) This is not the kind of "collaboration" Raytheon can successfully assert as blinding it to the operative facts of its claim, all of which were readily available well before March of 2004 and that it cites as the basis for its misappropriation claim.

This consideration leads into what is perhaps the most damaging factor for Raytheon: that it can point to no change in circumstances between 2000, when it ceased reposing trust in Indigo to perform consulting services, and March of 2004, when Raytheon had developed suspicions it deemed worth investigation. In other words, the blend of information that alerted Raytheon to the existence of its claim was available to, and known by, Raytheon long before it acted on that information. The termination of the parties' consulting relationship, Indigo's competitive successes in the military market—some of which came at Raytheon's expense, the continued hiring of

Raytheon personnel by Indigo and the ability to inspect its employee files were all well known by or readily available to Raytheon long before March of 2004. That combination would have "cause[d] a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action." *Borderlon*, 661 S.W.2d at 909; *Platt Elec. Supply*, 522 F.3d at 1057 (stating that a plaintiff discovers his cause of action when he "at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge [of the cause of action]. . ."); *Keilholtz v. Superior Fireplace Co.*, No. C 08-00836, 2009 U.S. Dist. LEXIS 30732, at *19 (N.D. Cal. Mar. 19, 2009) (stating that "it must be shown that in the exercise of reasonable diligence the facts could not have been discovered at an earlier date."). Raytheon's continued reliance on the expired July 30, 1997 agreement and the dormant CDAs became unreasonable as a matter of law, and it, therefore, could no longer avail itself of the estoppel effect of fraudulent concealment, assuming such was established in the first place.

And Raytheon's own actions demonstrate that had it timely investigated the facts available to it, it indeed would have drawn the conclusion that its intellectual property had been misappropriated. When it disassembled the Merlin camera in August of 2004 and reviewed its employee files in February of 2007—investigative steps, the court notes, that reflect common sense rather than any particular investigatory sophistication—Raytheon was able to press its claim in less than a month. But the circumstances that precipitated Raytheon's knowledge of its claim were well known to it before March of 2004, and "[k]nowledge of such facts is in law equivalent to knowledge of the cause of action." *Borderlon*, 661 S.W.2d at 909; *accord Norgart*, 981 P.2d at 88.

The *Seatrax* case provides an illustrative template. Mechanical Systems, Inc. ("MSI") had developed a brand of offshore cranes called Seaking. *Seatrax*, 200 F.3d at 362. MSI leased Seaking

technology to a company called Branham Industries, Inc. ("BII"). *Id*. The three individual defendants in the *Seatrax* case worked for BII on its Seaking operations. *Id*. After the MSI-BII licensing agreement expired, MSI sued BII for unpaid royalties. *Id*. During that litigation, MSI assigned its rights in the Seaking technology to Seatrax. *Id*. Also during that litigation, the three individual defendants left BII to form Sonbeck, an aftermarket supplier of Seaking parts. *Id*. at 362-63. Seatrax and Sonbeck entered into an agreement whereby Sonbeck would assist Seatrax in selling Seaking parts. *Id*. at 363, Years later, Seatrax learned that Sonbeck had been selling service manuals accompanying its products that bore trademarks registered to Seatrax. *Id*. During discovery, Seatrax learned that Sonbeck was in possession of 288 Seaking drawings. *Id*.

Seatrax addressed Sonbeck's statute of limitations defense with a fraudulent concealment claim. *Id*. at 366. The Fifth Circuit found that Seatrax's trade secret claim was barred by limitations. The court found that the combination of former BII employees starting a company that sold a line of products similar to those sold by Seatrax and the "innuendos and rumors" surrounding Sonbeck's entry into that market "created a red flag for possible misappropriation of trade secrets" that should have been investigated by Seatrax at an earlier date. *Id*. at 367.

If anything, Raytheon's lack of diligence is even more stark. Raytheon lost contracts in direct competition with Indigo rather than just hearing "rumors" of Indigo's ascent in the marketplace. In addition, four years had elapsed between the end of the Seatrax-Sonbeck realtionsip and the time Seatrax filed its lawsuit. In this case, Raytheon intends to lean on a relationship that had expired nearly *seven* years prior to its filing of this lawsuit in order to establish its claim for fraudulent concealment. Moreover, in this case, Raytheon was in possession of all of the tangible items it needed to conduct its investigation; only after discovery commenced did Seatrax actually learn that

Sonbeck was in possession of its intellectual property. *Id*. at 363.

Raytheon also asserts that the discovery rule applies to its claim for misappropriation. The discovery rule is an explicit part of the statute of limitations for trade secret misappropriation in both California and Texas. TEX. CIV. PRAC. & REM. CODE § 16.010(a); CAL. CIV. CODE § 3246.6. The discovery rule delays commencement of limitations until a plaintiff has discovered or should have discovered that he has sustained a legal injury. *Wagner & Brown*, 58 S.W.3d at 734; *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 919 (Cal. 2005). Thus, where a party "ha[s] reason to at least suspect that a type of wrongdoing has injured them," the statute begins to run and that party must either conduct a reasonable investigation into his injury or risk losing his right of action. *Id*. at 920. As one court described:

> Once the plaintiff has [or should have] a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.

*Garamendi v. SDI Vendome S.A.*, 276 F. Supp. 2d 1030, 1039 (C.D. Cal. 2003) (quoting *Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 928 (Cal. 1988).

Again, Raytheon argues that it had no reason to know that Indigo was stealing trade secrets because of the numerous confidentiality safeguards created by both parties. The circumstances that render the doctrine of fraudulent concealment unavailing ensure the same fate for Raytheon's discovery rule argument. Because the discovery rule charges Raytheon with the knowledge that it would have obtained through a reasonable investigation from the time that it was on notice that a reasonable investigation was necessary, and because, as discussed above, Raytheon was unreasonable in not engaging in that investigation, the discovery rule does not save its claim here.

*Id*. at 808; *Seatrax*, 200 F.3d at 365. In other words, "suspicion[] should have abounded" when Indigo continued to market products in competition with Raytheon after the July 30, 1997 agreement expired and after the parties stopped entering into additional CDAs. *Id*. at 366 (quoting *Computer Assocs. Intern v. Altai*, 918 S.W.2d 453, 457 (Tex. 1994)). Raytheon's argument that it only learned of the scope of Indigo's alleged wrongdoing during discovery conducted as a part of this lawsuit is unpersuasive. A party need not come to court knowing the full scale of his adversary's alleged wrongs; the machinery of discovery should be used to develop the case as it proceeds towards trial. *See Seatrax*, 200 F.3d at 363 (noting that only in discovery was it revealed that Sonbeck possessed Seatrax's intellectual property); *Platt Elec. Supply*, 522 F.3d at 1057 (noting that the specific facts supporting a cause of action "can be developed in pretrial discovery.") (quoting *Kline v. Turner*, 87 Cal. App. 4th 1369, 1374 (2001)). If the discovery rule were as lenient as Raytheon's portrayal, it "would effectively eviscerate the statute of limitations in all cases in which the plaintiff never discovers 'smoking gun' evidence of misappropriation." *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1218 (10th Cir. 2000).

Raytheon relies chiefly on two cases for its position that its suspicions of wrongdoing by Indigo in 1997 did not trigger the running of the statute of limitations. In *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, 318 F. Supp. 2d. 222 (D. Del. 2004), the court was faced with the issue of whether the statute of limitations began to run on Dunlop, which had voiced concerns over a competitor's hiring practices. *Id*. at 223-24. The court concluded that a letter sent years earlier by Dunlop to Callaway did not suggest that it had "discovered or should have discovered" misappropriation of its trade secrets. *Id*. at 225. But the letter in *Callaway* "at most" suggested that "Dunlop was aware of the possibility that Callaway might misappropriate its trade

secrets in the future." *Id*. However, Raytheon was actually aware of, or could have accessed, each fact on which it bases its trade secret misappropriation claim before March of 2004. Additionally, Dunlop filed its claim nineteen months after Callaway introduced the infringing product into the market, whereas Raytheon waited nearly four years from the time it knew or had available to it all of the information on which it bases its claim.

Raytheon also relies on *Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp 1258 (N.D. Cal. 1991). There, the court extended the benefit of the discovery rule to the plaintiff because "suspicion and fear are not sufficient predicates for launching a lawsuit, and to file an action with no other basis would offend norms articulated in rules like Federal Rule of Civil Procedure 11." *Id*. at 1266. But where the plaintiff "knows or, by exercising reasonable diligence, should know of the facts giving rise to the claim," he can no longer rely on the discovery rule. *Wagner & Brown*, 58 S.W.3d at 734; *accord Norgart*, 981 P.2d at 88. The evidence demonstrates as a matter of law that Raytheon knew or should have known of all of *the facts* on which it bases its trade secret misappropriation claim before March of 2004. And the reasonable investigation that Raytheon did conduct, albeit too late, demonstrates that discovery of its claim was within its grasp. Thus, Raytheon's reliance on *Intermedics* is unavailing because long before March of 2004, it was aware of much more than "suspicion and fear" with regard to its misappropriation claim.

### IV. CONCLUSION[4]

The court finds that Raytheon's claim for misappropriation of trade secrets against the Defendants is barred by the applicable statute of limitations as a matter of law. Raytheon's failure

---

[4]The Defendants state in their Motion for Summary Judgment their desire to withdraw another currently pending MSJ dealing with the statute of limitations issues. (de # 357 at 4-5.) That Motion (de # 66) should be, and hereby is, DENIED AS MOOT.

to act timely on readily available and exceptionally suggestive facts defeats its fraudulent concealment claim and, by extension, its trade secret misappropriation claim. Additionally, Raytheon has abandoned its claims of tortious interference and unfair competition. As such, there is no genuine issue of material fact regarding the Defendants' liability for Counts I, V, VI and VIII of Raytheon's Second Amended Complaint. Therefore, the court is of the opinion that the Defendants' Motion for Summary Judgment (de # 357) should be, and hereby is, GRANTED and that Raytheon's Motion for Summary Judgment (de # 356) should be, and hereby is, DENIED. The court's resolution of these Motions renders decision on the "Defendants' Motion for Summary Judgment on Plaintiff's Claims for Trade Secret Misappropriation, Tortious Interference, and Unfair Competition" (de # 362) unnecessary. Accordingly, that Motion should be, and hereby is, DENIED AS MOOT.

    IT IS SO ORDERED.

    **SIGNED this the 31st day of August, 2009.**

*/s/ Richard A. Schell*
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE